NO. 7939. **7939** STATE OF LOUISIANA

EL RENO MILL & ELEVATOR CO

VS

COURT OF APPEAL

H. H. DANIELS & CO, ET AL.    PARISH OF ORLEANS.

**7939**

OPINION.

By his Honor John St. Paul.

This is an action for damages for alleged breach of two several contracts. The judgment below allowed damages on the first contract substantially as prayed for, but gave only nominal damages on the second. Defendants appealed; and plaintiffs answered, praying that they be allowed substantial damages as well on the second as on the first contract.

I.

As to the first contract: Defendants, in September 1910, bought of plaintiffs three carloads of flour for October delivery; of which they accepted two carloads, and paid for them. As to the third carload they put off calling for it until the beginning of December; and when it reached here, paid no further attention to it. So that at the end of January the Railroad Company notified the shipper (plaintiff) that the flour was still on hand. Whereupon plaintiffs, by letter and telegram, urged defendants to receive the flour and pay for it. To all of which, defendants again paid no attention whatever; not even answering.

Thereupon plaintiff sent a representative to look after the shipment; who testified, with his written contemporaneous report before him (dated May 16th), that

defendants "gave him their word" that they would take out the flour and pay for it on "Tuesday of next week (May 23rd)." But defendants did not take out the flour and pay for it either on that day or any other day.

And so, after waiting until June 17th, plaintiffs again wired defendants to state their intention; to which telegram defendants again paid no attention. Which telegram was confirmed by letter of the same date, wherein plaintiffs said, "We desire to know at once whether or not you intend to take up this draft, so that we will know how to govern ourselves. Please let us hear from you". To which letter defendants answered by letter on June 20th, "we will take up your draft by June 25th as promised your Mr. Humphreys when he was here, and which was agreed to by him". But this answer never reached plaintiffs.

On June 26th (Monday) defendants wrote again, "Your letter of June 22nd received. We note that you have made other arrangements regarding the car now here. We sent to the Bank last Friday (June 23rd) to pay your draft, and were told by the note clerk that you had ordered it turned over to some one else. We also note you have cancelled our order for the 500 barrels due us (second contract); we are surprised at your actions as they are not in accordance with the agreement made with your Mr. Humphreys whilst he

was here x x x. As per our letter of June 20th, we are ready, able and willing to take the 500 barrels due us." In which we observe not a word of protest against turning over the carload of flour on hand, beyond a very mild expression of surprise.

Be this as it may; defendants swear that Humphreys gave them until June 25th to take up the draft. But on observing that June 25th was a Sunday, they explain that no date was fixed, but that the delay given was 30 days, which extended to that day; Mr Humphreys being here "about May 20th."

But the fact is that the contemporaneous report of Mr. Humphreys, which forms part of the res gestae, shows that he was in this city on May 16th, on his way to Havana; that he reported (to his father) that his interview with defendants had taken place that day, and he had granted them only until the following Tuesday; that he requested to be informed by Cable at Havana in case defendants defaulted, as he could "arrange to come back this way if necessary." All of which is far more conclusive than any testimony given nearly ten years after the occurence. And moreover note this; that 30 days from May 16th (about which there can be no doubt whatever) extend only to June 15th and not to June 25th.

We have therefore no more doubt than had the district judge, that defendants were not given until June 25th, to take up the draft; and that when plaintiffs turned over the flour to a broker on June 19th, they had indulged defendants beyond any possible time agreed upon.

As to the quantum of loss upon the flour, the testimony shows that it was turned over to a highly reputable broker to be disposed of to the best advantage; that he had the flour examined and found it in bad condition; that he sold it on July 3rd for the best price he could obtain after trying (say two weeks from June 19th).

A great deal of testimony was taken to show that flour improves in quality whilst it lies in storage, and that the presence of weevils does not damage it or lessen its value. But the district judge was not favorably impressed by this line of testimony, and neither are we. Still all this matters not; for the fact remains that a reputable broker, endeavoring to do the best he could for his clients, could get no better price for the flour than he did. And that one fact carries much more weight with us that we are at all disposed to attach to the speculative opinions of witnesses testifying ten years after the event.

The loss on this contract was $1 a barrel on 191 barrels (382 sacks); plus $66.86 of charges; a total of $257.86.

The second contract was entered into in January for February delivery; and suffice it to say, without going into details, that defendants acted about this contract much in the same manner as they did about the first. So that plaintiffs cancelled it on June 22nd, saying; "The flour is now worth $4 delivered in New Orleans. We will expect you to stand the difference (50 cents a barrel on 500 barrels)".

To establish this claim plaintiffs rely exclusively on the testimony of Humphreys, as follows; " x x x The contract was breached by Daniels & Co, by reason of which we suffered damage of 50 cents per barrel, or $250 in the aggregate, because of the fall in the market price of flour x x x (and again) Said flour was not sold to any other person as a seperate parcel of flour, but was disposed of in the usual course of trade".

It will be observed that the witness does not say that the flour was sold for less than the price which defendants had agreed to pay. And the proposition is therefore simply this; that because the market price of flour dropped 50 cents a barrel in New Orleans, therefore an Oklahoma miller (with all these broad United States, and the whole world besides, as a market) thereby lost 50 cents a barrel on each barrel of flour (even though still in his own mill) which any New Orleans merchant had agreed to buy, but did not buy; and

whether or not the flour could be sold  (or even had been sold) in New York or San Francisco, or London or Hong Kong, or El Reno, for a price sufficient to net the miller as much, or even more than the net price agreed upon with the New Orleans Merchant.

Upon which, as a proposition of law, we will not elaborate; for it suffices for this case, to say that the evidence shows the "market price" of flour in New Orleans had not fallen atxall, and that actual sales took place at a price even higher.

As to this contract the trial judge allowed only nominal damages ($2); and this we think correct.

The judgment appealed from is therefore affirmed.
New Orleans La, June 13th, 1921.